The STATE of Ohio, Appellee and Cross–Appellant,

v.

MARTIN, Appellant and Cross–Appellee.

[Cite as *State v. Martin,* 151 Ohio App.3d 605, 2003-Ohio-735.]

Court of Appeals of Ohio,
Third District, Putnam County.

No. 12–02–01.

Decided Feb. 20, 2003.

606

608

Kurt Sahloff, Putnam County Prosecuting Attorney, for appellee and cross-appellant.

David H. Bodiker, State Public Defender, and Theresa G. Haire, Assistant Public Defender, for appellant and cross-appellee.

Thomas F. Bryant, Presiding Judge.

{¶ 1} Defendant-appellant, Marvin Martin II, appeals from the judgment of conviction and sentence rendered by the Court of Common Pleas, Putnam County, upon a jury finding him guilty of one count of aggravated murder in violation of R.C. 2903.01(A) and one count of aggravated menacing in violation of R.C. 2903.21(A). For these crimes, appellant was sentenced to concurrent sentences of six months incarceration and life imprisonment without the possibility of parole. For the reasons set forth in the opinion below, we affirm the convictions and sentences.

{¶ 2} The record presents the following facts. On December 26, 2000, Linda Breckler called the Putnam County Sheriff's Department to report multiple gunshots fired in her direction at her house on 403 Logan Street, Dupont, Ohio. Deputy Michael Chandler responded to the call and discovered several windows in Linda's van and house damaged by gunfire. Chandler attempted to canvass the area where Linda perceived the shots to have originated but was unable to collect physical evidence due to the onset of a heavy snowfall. Linda told the deputy she suspected that her former son-in-law, Marvin Martin II, the appellant herein, fired the shots. Martin is the ex-husband of Linda's daughter, Brenda Breckler. Linda did not witness Martin fire the shots, but cited a history of confrontations between the Breckler family and Martin as the source of her suspicions. Based on Linda's accusations, sheriff's deputies questioned Martin about the incident, but charges were never brought.

{¶ 3} On May 9, 2001, at approximately 7:40 a.m., Linda Breckler's son, Charles E. Breckler, 15, was found dead on the couch at his sister's house at 207 Maple Street, Dupont, Ohio. Charles lived with his mother, Linda Breckler, at 403 Logan Street, but often slept at his sister Jennifer Plummer's house, located just a few blocks away from Logan Street. The cause of death was determined

to be a single gunshot wound to the forehead. No weapon was found at the scene.

{¶ 4} Following the discovery of Charles' body, representatives of the sheriff's department and the local office of the Ohio Bureau of Criminal Investigation ("BCI") processed the scene for evidence. Meanwhile, Linda Breckler insisted that Marvin Martin II was responsible for Charles's murder. Sheriff's deputies located Martin in Continental, Ohio, where he lived with his parents. Martin advised police that he had worked at a local farm equipment auction until late the previous evening, after which he had returned home and immediately gone to bed. Sheriff's deputies took Martin into custody and escorted him to the sheriff's department for further questioning. At that time, deputies conducted a consensual search of the Martin home and seized a pair of muddy Nike athletic shoes and a set of damp clothing recovered from the clothes dryer.

{¶ 5} Throughout the questioning on May 9, 2001, Martin maintained that he was not involved in Charles Breckler's death. Martin admitted that he and the victim had not enjoyed a friendly relationship since he and his ex-wife's wedding reception in 1999. According to Martin, Charles caused a scene at the reception by playing loud music, drinking alcohol, and writing obscenities in a guest book. Despite this and subsequent confrontations with the victim, Martin insisted that the Breckler family often blamed him for things he did not do. Appellant was released from custody that same day.

{¶ 6} An extensive police investigation ensued, wherein appellant remained the primary suspect. On May 11 and 12, 2001, sheriff's deputies and local volunteers combed fields and woods between the Martin home in Continental and the Breckler/Plummer home in Dupont. The search culminated in the discovery of a trail of footprints across several plowed fields. Along that path, police discovered a pair of orange rubber gloves and a .22–caliber rifle tucked inside of a hollow log. On May 28, 2001, Deputy Michael Chandler conducted a followup investigation of the December 26, 2000 shooting at Linda Breckler's. Chandler searched the scene using a metal detector and recovered a spent shell casing that was later determined to have been fired from a .22–caliber rifle.

{¶ 7} Meanwhile, the ongoing investigation into Charles Breckler's death revealed the following information: (1) appellant purchased a .22–caliber rifle from Glen Bradley on December 24, 2000, (2) two weeks before Charles's death a former classmate saw appellant walking down the road in Dupont with a .22–caliber rifle slung across his back, and (3) Chad Okuley, another former classmate, saw appellant walking through Continental at approximately 6 a.m. on May 9, 2001, the morning Charles's body was discovered.

{¶ 8} Based upon this evidence and in conjunction with information obtained by sheriff's deputies through conversations with Martin, the subject matter of

which we will discuss in greater detail below, the Putnam County Grand Jury indicted appellant on August 2, 2001, for one count of aggravated murder in violation of R.C. 2903.01(A) with a death specification and one count of aggravated menacing in violation of R.C. 2903.21(A). Martin entered a plea of not guilty on both counts. On September 20, 2001, Martin filed a motion to sever counts of the indictment, which the trial court denied.

{¶ 9} On January 24, 2002, the Putnam County Crime Victim Services filed a motion requesting that certain individuals, identified as members of the victim's family, be permitted to attend all proceedings at which the defendant was present. However, the same members of the victim's family were subpoenaed by the prosecution as witnesses for trial. Pursuant to a separation-of-witnesses request by the defense, the trial court determined that the victim's family members could remain in the court room after each had delivered his or her testimony and was excused as a witness. The jury trial commenced on January 28, 2002.

{¶ 10} On February 7, 2002, the jury returned guilty verdicts on Counts I and II. Thereafter, the sentencing phase commenced. On February 8, 2002, pursuant to the jury's recommendation, the trial court sentenced Martin to life in prison without the possibility of parole on Count I and to six months incarceration for Count II, with the sentences to run concurrently. The trial court filed the judgment entry of sentencing on February 15, 2002. It is from this order that appellant now appeals.

{¶ 11} On May 29, 2002, appellant, through appointed appellate counsel, filed a merit brief with this court advancing one assignment of error. Subsequently, appellant's counsel moved to withdraw as appellate counsel. The court granted the motion and appointed the Ohio Public Defender's Office to represent appellant. Next, appellant filed a motion requesting that he be allowed to proceed with the appeal pro se. Additionally, appellant requested that the original merit brief filed by his first appellate counsel be stricken. On August 1, 2002, we denied appellant's request to remove the Ohio Public Defender's Office as counsel of record but granted him leave to file a pro se supplemental merit brief. Additionally, we denied appellant's motion to strike the May 29, 2002 merit brief.

{¶ 12} Thereafter, on August 9, 2002, the Public Defender's Office submitted a supplemental merit brief on behalf of appellant, asserting two additional assignments of error. Appellant filed an additional supplemental merit brief on September 2, 2002, asserting five assignments of error. Consequently, there are now eight assignments of error before this court; assignment of error one by appellant's first appellate counsel of record, assignments of error two and three by the Public Defender's Office, and assignments four through eight by appellant pro se.

{¶ 13} Furthermore, on March 20, 2002, the state filed a motion for leave to appeal the trial court's decision to exclude certain members of the victim's family from the courtroom pending their excusal as witnesses. On May 30, 2002, we granted the state's motion. Additionally, the Putnam County Crime Victim Services filed a request and was granted leave to file a brief as amicus curiae in support of the state's cross-appeal.

{¶ 14} Appellant raises the following assignments of error:

{¶ 15} "I. The trial court committed an error of law by denying Appellant's CrimR.29 motion for the evidence was insufficient to prove prior calculation and design, resulting in the judgment being against the manifest weight of the evidence.

{¶ 16} "II. The trial court erred in permitting evidence of prejudicial 'other acts,' thereby denying Appellant his rights to due process of law and to a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

{¶ 17} "III. The trial court erred by denying Appellant's motion to sever the second count of the indictment from the trial of the first count, thereby denying Appellant his rights to due process of law and to a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

{¶ 18} "IV. The trial court committed an error of law by denying Appellant's motion to suppression of the Appellant's statements on six different dates against the rights of due process.

{¶ 19} "V. The trial court committed an error of law in motion of discovery grant to the Appellant, rules of evidence to disclose Brady material.

{¶ 20} "VI. The trial court committed an error of law by denying Appellant's objection to not having tape transcribed and substituting summaries against right of due process.

{¶ 21} "VII. The trial court committed an error of law by limiting Appellant's rights to cross examination.

{¶ 22} "VIII. The trial court erred by admitted rifle denying Appellant's rights to due process."

{¶ 23} Appellee state of Ohio submits the following assignment of error on cross-appeal:

{¶ 24} "It was error for the trial court to overrule the motion of Crime Victim Services requesting permission that certain victims be permitted to attend all proceedings in which the defendant was to be present."

**I**

{¶ 25} Appellant's first assignment of error alleges that the trial court committed an error of law when it denied his Civ.R.29(A) motion to acquit, since the state presented insufficient evidence of prior calculation and design to sustain his conviction for aggravated murder. Appellant also contends that the weight of the evidence presented at trial fails to support his conviction for aggravated murder. Again, appellant argues that the state failed to establish the element of prior calculation and design. Appellant's argument is not well taken.

{¶ 26} The legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, paragraph two of the syllabus. In reviewing a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148.

{¶ 27} On the other hand, weight of the evidence concerns " 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*' (Emphasis added.)" *State v. Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting Black's Law Dictionary (6th Ed.1990) 1594. In reviewing whether the verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether " 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " Id., quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 28} Appellant was charged with and convicted of aggravated murder for the death of Charles Breckler.[1] R.C. 2903.01(A) provides, "No person shall

---

1. Appellant was also charged with and convicted of aggravated menacing for the December 26, 2000 shooting at Linda Breckler's house. Appellant does not raise error with respect to this conviction.

purposely, and with prior calculation and design, cause the death of another * * *.' " '[P]rior calculation and design' requires 'a scheme designed to implement the calculated decision to kill.' " *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, quoting *State v. Cotton* (1978), 56 Ohio St.2d 8, 11, 10 O.O.3d 4, 381 N.E.2d 190. Appellant argues that even if the state established and the jury believed that he was responsible for Charles's death, the state did not prove the existence of a calculated decision to kill. Appellant argues that the evidence presented at trial merely created an inference that his encounter with the victim was coincidental to some other purpose for his presence at Jennifer Plummer's house on May 9, 2001. We disagree.

{¶ 29} The state presented the following evidence in support of its contention that appellant committed aggravated murder. On May 9, 2001, appellant told sheriff's deputies that he had been home sleeping from 11 p.m. the previous evening until after 7 a.m. that morning. However, Chad Okuley testified to seeing appellant walking through the streets of Continental, with a coat draped over his arm, at approximately 5:55a.m. on May 9, 2001. Martin's mother testified that when she woke up on the morning of May 9, 2001, appellant was not on the couch where he had gone to sleep the night before. She noticed that the washing machine was running and saw her son's wet, muddy athletic shoes. Moments later, sometime after 7 a.m., appellant's mother witnessed her son enter through the front door, wearing no shoes or socks. Charles Soto, the Martins' next-door neighbor, testified to seeing appellant walking down the road towards the Martin home some time after 7 a.m. that same morning. Soto stated that Martin was not wearing a coat or carrying one. Police later found a camouflage jacket slung across an outside stair rail at Martin's rental property in Continental. Forensic specialists later identified blood on the jacket as belonging to Martin.

{¶ 30} A few days after the death of Charles Breckler, sheriff's deputies found two trails of footprints stretching across several fields, traveling in and out of Dupont. The first trail of prints cut a southbound path from a wooded plot of land towards Dupont. The distance between the prints indicated that their creator had been walking. The second path of prints covered a considerably longer distance and traveled north away from Dupont, in the general direction of Continental. The distance between the prints in this second path indicated a running stride was used to create them. Ted Manasian, a BCI forensic examiner compared the footprints with the muddy shoes seized by police at Martin's home. Though he could not say for sure whether the prints were made by that particular pair of shoes, Manasian was sure that the prints were made by the exact same style and size of Nike athletic shoe. Additionally, the footprints

found by police were described as having a severe "instep." Appellant told a sheriff's deputy that he walked with a pronounced instep.

{¶ 31} Along the path marked by the footprints, sheriff's deputies discovered a pair of orange rubber gloves and a .22–caliber Marlin bolt-action rifle. The rifle was hidden inside a hollow log, not far from where the trail of footprints entered a wooded area. Appellant denied that he owned such a weapon. However, Glen Bradley testified that he had sold Martin a .22–caliber Marlin bolt-action rifle on December 24, 2000. While Bradley could not recall the serial number of the weapon he had sold to appellant, he did state that the weapon found by police looked exactly like the weapon he sold to Martin. William Mark, a BCI forensic weapons specialist, examined the bullet fragments taken from Charles Breckler's brain. Because the fragments were so badly damaged, Mark could not conclusively link them to the rifle found by police. However, Mark testified that based upon an examination of the "land and grove impressions" on the fragments, he was sure that the fragments had been fired from a Marlin brand rifle.

{¶ 32} Shelia Dickey, appellant's former coworker, testified that in November 2000, appellant told her that he was going to "kill" a "punk kid." When Dickey suggested that Martin didn't really mean he would commit murder, appellant demonstrated the seriousness of his intent by framing his hand into the shape of a gun, pointing it to Dickey's head and stating that he was going to "take a gun and put the gun between his eyes and fucking shoot him." Shanda Moore, Martin's friend, testified that one week prior to Charles's death, Martin told her that he was "going to kill Chuckie." Rosemary More, another friend of appellant's, testified that around that same time, Martin told her that he was going "to hurt Chuckie really bad." When Rosemary asked why, Martin indicated that he was still upset over Charles's behavior at his wedding reception two years before. Damien Green, a current inmate at Lima Correctional Institution, testified that while sharing a cell with Martin in the Allen County Jail, he heard Martin confess to killing Charles Breckler. According to Green, Martin admitted that he walked from his parents house to the victim's house and shot him in the head.

{¶ 33} On the day of the murder, when being questioned by Detective Marvin Schwiebert, Martin indicated that he thought that an old acquaintance from his Army days had killed Charles, a man by the name of Hurster. Martin would not say why Hurster would want to kill Charles. In July 2001, Martin approached sheriff's deputy Harry Berger to inquire about the status of the Breckler homicide investigation. Initially, Berger indicated that he could not give Martin particulars but advised him to seek counsel. Later, Berger sought and obtained permission to speak with Martin in more detail. Berger took Martin for a drive and showed him the location of the footprints found by police and also pointed out

the spot where the gloves and rifle were found. At that time, Martin told Berger that the police would not find fingerprints on the rifle because Hurster wiped it down. Upon further inquiry, Martin told Berger that Hurster is one of his clones and that he himself is a clone created by the military. According to Martin, Hurster and other clones, known as the Death Squad, were trying to frame him for Charles Breckler's murder.

{¶ 34} Later, with Deputy Berger present, Martin relayed the clone story to Deputy Mark Brecht, but this time included more details. Martin stated that on the night of Charles's murder, he entered the mind of Hurster, one of his clones, just before the clone entered 207 Maple Street through the rear door. Martin stated that he could see the kitchen light on and saw Hurster walk through the living room where "Chuckie" was lying on the couch. Hurster then looked around the house in search of Martin's infant daughter so that he could capture the child for her DNA. When Hurster didn't find the child, the clone returned to the living room and saw Chuckie stir on the couch. Hurster then walked up to Chuckie, put the gun to his forehead, and fired the rifle. Martin then described in detail Hurster's retreat from Maple Street, through the fields, to the woods where the gun was hidden. Martin said that after he hid the rifle, Hurster removed the orange gloves and ran into another plot of woods. Martin could not remember anything further.

{¶ 35} After viewing the evidence in a light most favorable to the prosecution, we find sufficient evidence from which a rational trier of fact could have found the appellant to have purposely and with prior calculation and design caused the death of Charles Breckler. The evidence, if believed, established that after telling several people that he planned to kill Charles Breckler, appellant bought a weapon. Then, sometime in the early morning hours of May 9, 2001, appellant walked several miles across plowed fields, shot the victim, walked back across the fields, painstakingly hid the weapon, and then discarded the gloves he had worn. Upon returning to his parents home he immediately took off his muddy shoes and put his clothing into the washing machine. These facts are sufficient to prove that he had "adopted a plan to kill." See *State v. Toth* (1977), 52 Ohio St.2d 206, 213, 6 O.O.3d 461, 371 N.E.2d 831. Therefore, the trial court properly denied the Crim.R.29 motion for acquittal with respect to the aggravated murder charge.

{¶ 36} Furthermore, we find that greater amount of credible evidence supports the appellant's conviction for aggravated murder. The murder weapon was determined to be a Marlin brand rifle. Appellant owned a .22–caliber rifle made by Marlin, though he lied about this to police. Appellant was seen walking through the town of Continental on the morning of the murder but claimed to have been home sleeping. In the days and months prior to Charles's death, appellant was boisterous and adamant about his hatred of the victim and his

intent to kill or harm him. Appellant knew the color of the gloves found by police before anyone revealed their color to him. In the days following the discovery of Charles's body, Martin demonstrated a curious preoccupation with the murder, approaching the police about the status of the investigation. Upon finding out that police had discovered footprints, gloves, and a weapon, Martin came up with a story about secret clones and government conspiracies to steal his DNA.

{¶ 37} The footprints found by police mark a path between Martin's home in Continental and the Plummer home in Dupont. The footprints were determined by an expert to have been made by a Nike athletic shoe, the same style and size of the shoes owned by Martin and seized by police. The prints had a pronounced instep and Martin admitting to walking with a pronounced instep. The pattern of the path was at times in a "zigzag" formation. Martin explained to police that the military trained the clones to evade the enemy by running in this manner.

{¶ 38} Appellant argues that the manifest weight of the evidence suggests that since Charles Breckler's primary residence was not the house on Maple Street, the killing was a mere coincidence to some other purpose for appellant's presence at the Maple Street location. We find no merit in this argument, as there is no evidence in the record that Martin had any reason to be at the murder scene. In fact, throughout the trial, the defense argued that Martin was home sleeping and nowhere near Maple Street on May 9, 2001. To argue now that the evidence establishes that he was there for some other purpose is unreasonable. Accordingly, appellant's first assignment of error is overruled.

## II

{¶ 39} Appellant's second assignment of error argues that the trial court committed reversible error when it permitted the state to introduce evidence of prior bad acts in violation of Evid.R. 404(A). Specifically, appellant contends that all evidence of the December 26, 2000 shooting at Linda Breckler's was introduced as evidence of his bad character and was therefore inadmissible. We disagree.

{¶ 40} Appellant's argument ignores the fact that he was on trial for aggravated murder *and* aggravated menacing. The aggravated menacing charge was based upon the events of December 26, 2000. Thus, any evidence pertaining to that event was admissible not to prove that appellant committed the aggravated murder but to prove the elements of aggravated menacing as charged in Count II of the indictment. Notably, appellant's defense counsel did not object during trial to testimony or physical evidence regarding the December 26, 2000 shooting; therefore, all but plain error is waived. We do not find error, plain or otherwise, in the admission of evidence introduced to prove Count II of the indictment. Appellant's second assignment of error is overruled.

III

{¶ 41} In his third assignment of error, appellant contends that the trial court erred when it denied his motion to sever Counts I and II of the indictment. According to appellant, he was prejudiced when the trial court allowed the state to go forward with both counts in one trial. We disagree.

{¶ 42} The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged "are of the same or similar character." *State v. Coley* (2001), 93 Ohio St.3d 253, 754 N.E.2d 1129, quoting *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 421 N.E.2d 1288. Under Crim. R.8(A), offenses that are based on acts "connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct" may also be joined. Id. If it appears, however, that a defendant or the state is prejudiced by a joinder of offenses, Crim.R.14 provides that a trial court shall order a separate trial of counts or provide such other relief as justice requires. It is a matter within the discretion of the trial court as to whether an accused shall be tried separately on the different counts of an indictment. *State v. Strobel* (1988), 51 Ohio App.3d 31, 554 N.E.2d 916.

{¶ 43} When a defendant claims prejudice from joinder, a prosecutor has two options to rebut the claim. The first is the other-acts test, under which the state can argue that it could have introduced evidence of one offense in the trial of the other pursuant to Evid.R. 404(B). *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293. The second is the joinder test, under which the state is merely required to show that evidence of each of the crimes joined at trial is simple and direct. Id. When simple and direct evidence exists, an accused is not prejudiced by joinder regardless of whether the evidence is admissible as other-acts evidence. *State v. Coley*, 93 Ohio St.3d at 260, 754 N.E.2d 1129.

{¶ 44} Here, the state satisfied both tests. The evidence of the December 26, 2000 shooting would have been admissible under Evid.R. 404(B) as evidence of identity. In *State v. Williams* (1995), 73 Ohio St.3d 153, 652 N.E.2d 721, the Ohio Supreme Court held that evidence tending to show that the same weapon was used in an assault on one victim and an aggravated murder of another was pertinent to the issue of identity. Similarly, in the case at bar, there is evidence that the same weapon was used in the December 26, 2000 aggravated menacing incident and the May 9, 2001 aggravated murder. Ballistics evidence conclusively showed that shell casings found outside of Linda Breckler's home, believed to be from the December 26, 2000 shooting, were fired from the weapon found by sheriff's deputies in a wooded plot of land between Dupont and Continental. The weapon found by sheriff's deputies was a .22–caliber Marlin bolt-action rifle. Three witnesses can connect appellant to purchasing or possess-

ing a .22–caliber Marlin bolt-action rifle. Finally, the bullet fragments retrieved from Charles Breckler's brain were conclusively determined to have been fired from a Marlin rifle.

{¶ 45} Moreover, we find that the evidence proffered in support of Counts I and II of the indictment was simple and direct, so that the jury was capable of segregating the proof on each charge. See *State v. Roberts* (1980), 62 Ohio St.2d 170, 175, 16 O.O.3d 201, 405 N.E.2d 247. Consequently, we find that appellant was not prejudiced by the joinder of offenses and that the trial court did not abuse its discretion when it refused to grant a severance of the indictment. Accordingly, appellant's third assignment of error is overruled.

## IV

{¶ 46} In his fourth assignment of error, appellant contends that the trial court violated his constitutional right to due process of law by denying his motion to suppress the contents of oral statements given to sheriff's deputies, by himself, on May 17, June 20, and July 11, 17, 23 and 31, 2001. We disagree.

{¶ 47} The standard of review regarding motions to suppress is whether the trial court's findings are supported by competent, credible evidence. *State v. Vance* (1994), 98 Ohio App.3d 56, 58–59, 647 N.E.2d 851. "At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact." *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. However, an appellate court will make an independent determination of the law as applied to the facts. *State v. Vance*, 98 Ohio App.3d at 59, 647 N.E.2d 851.

{¶ 48} In the matter sub judice, the trial court conducted a pretrial suppression hearing on six statements given by appellant to sheriff's deputies. Ultimately, the trial court determined that the appellant was not in custody when he made the statements and that appellant gave all six statements voluntarily. Appellant readily admits that he was not in police custody when he gave the statements but instead argues that a police officer may not conduct an interrogation of a witness unless that person is in custody and has been apprised of his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Appellant misunderstands the law in this regard.

{¶ 49} There is no requirement that a peace officer take someone into custody as a prerequisite to interrogating him. On the contrary, only a custodial interrogation triggers the need for a *Miranda* warning. *State v. Noggle* (2000), 140 Ohio App.3d 733, 749 N.E.2d 309, quoting *State v. Mason* (1998), 82 Ohio St.3d 144, 153, 694 N.E.2d 932. See, also, *Oregon v. Mathiason* (1977), 429 U.S. 492, 494, 97 S.Ct. 711, 50 L.Ed.2d 714. It is the coercive nature of custodial

interrogation that necessitates the *Miranda* warnings, thus the warnings are not necessary in nonthreatening, nonconfining circumstances.

{¶ 50} Because we find competent credible evidence to support the trial court's determination that appellant gave all six statements to police voluntarily and in a noncustodial setting, we reject appellant's assertion that his statements were inadmissible based on the failure of the officers to take him into custody and deliver the *Miranda* warnings to him. Accordingly, appellant's fourth assignment of error is overruled.

## V

{¶ 51} Appellant's fifth assignment of error essentially accuses the prosecution of failing to turn over exculpatory evidence as ordered by the trial court. We do not find appellant's argument to be well taken.

{¶ 52} In *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the United States Supreme Court held that the prosecution has a duty to disclose to a defendant, upon request, any material evidence in the state's possession favorable to the defense. The *Brady* requirement is codified under Ohio law in Crim.R. 16(B)(1)(f), which requires the prosecutor to disclose "all evidence * * * favorable to the defendant and material either to guilt or punishment." "[T]he principles of *Brady* do not apply unless the evidence is material to mitigation, exculpation or impeachment." *State v. Keene* (1998), 81 Ohio St.3d 646, 693 N.E.2d 246, citing *Calley v. Callaway* (C.A.5, 1975), 519 F.2d 184, 221. Appellant claims that the prosecution had knowledge of a deposition given by Detective Marvin Schwiebert in the course of a civil lawsuit filed by Linda Breckler against appellant. According to appellant, Schwiebert's deposition would have been highly relevant to his defense. We find no merit to appellant's assertion.

{¶ 53} The record demonstrates that the trial court ordered the prosecution to examine all physical and documentary evidence for *Brady* material and to deliver all *Brady* material to the defense. Appellant fails to show that Marvin Schwiebert's deposition in a civil lawsuit was in the state's possession, much less that document was material to mitigation, exculpation, or impeachment. What's more, appellant, as the defendant in the civil lawsuit, surely had access to the deposition and the alleged exculpatory material contained within. Finally, the deposition appellant speaks of is outside the record, and thus, even if it did contain exculpatory material, we cannot consider it on direct appeal. *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500, paragraph one of the syllabus. For these reasons, appellant's fifth assignment of error is overruled.

## VI

{¶ 54} In his sixth assignment of error, appellant contends that the trial court committed an error of law by denying his objection to the substitution of summarized versions of various taped, pretrial statements for fully transcribed versions of those statements.

{¶ 55} Appellant fails to identify with particularity his perceived error. Several videotapes and audiotapes were collected during the investigation below. After reviewing the record, it is apparent that the prosecution created summaries of several of those tapes and turned them over to the defense. It is also evident from the record that some of those tapes were transcribed by court reporters. We are unable to locate the trial court's order to transcribe the tapes or the appellant's objection to the summarization of the tapes, to the denial of which appellant now assigns error.

{¶ 56} Even if we were to find that the trial court committed an error, appellant fails to allege or show prejudice. He vaguely makes reference to exculpatory statements contained within certain audiotapes and videotapes but fails to identify the nature of those statements. Furthermore, we find that the appellant had access to all of the audiotapes and videotapes contained in the record. Appellant, therefore, had access to any alleged exculpatory information found on the tapes and could not have been prejudiced by their summarized form. Accordingly, appellant's sixth assignment of error is overruled.

## VII

{¶ 57} In the seventh assignment of error, appellant argues that the trial court committed an error of law by limiting his right to cross-examination. Specifically, appellant claims that the court limited defense counsel's cross-examination of sheriff's deputy Harry Berger, thereby denying him the ability to explore exculpatory evidence. There is no merit to appellant's assertion.

{¶ 58} Cross-examination shall be permitted on all relevant matters and matters affecting credibility. Evid.R. 611. However, a trial court has discretion over the scope of cross-examination and "such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *State v. Slagle* (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916.

{¶ 59} In the case at bar, defense counsel William Kluge, while conducting the cross-examination of Berger, repeatedly referred to a written transcript of Berger's July 24, 2001 conversation with appellant. Kluge read statements made by appellant and inquired of Berger as to their authenticity. After allowing this to go on for several minutes, the trial court summoned the attorneys

for both sides to a bench conference. Whereupon the trial court indicated that if the defense wanted appellant to testify, they should bring him to the stand. Alternatively, the court offered to allow the entire transcript to be entered into evidence rather than just the portions the defense counsel chose to point out. Defense counsel opted to cease referring to the transcript at that time.

{¶ 60} Our review of the proceeding below fails to reveal any unconstitutional limitation of defense counsel's ability to cross-examine sheriff's deputy Harry Berger. The trial court did not *limit* the scope of cross-examination, but rather ordered defense counsel to stop reading hearsay statements into evidence. Defense counsel remained free to ask Berger any manner of question deemed essential. Accordingly, we find no abuse of discretion and reject appellant's seventh assignment of error.

## VIII

{¶ 61} In his eighth and final assignment of error, appellant argues that the trial court erred when it admitted the .22–caliber Marlin bolt-action rifle, found by sheriff's deputies hidden inside of a hollow log, into evidence over the objection of the defense. According to appellant, the admission of the rifle prejudiced him because it could not be identified as the murder weapon. We disagree.

{¶ 62} The decision of whether to admit evidence rests in the sound discretion of the trial court. *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 437, 715 N.E.2d 546, citing *Peters v. Ohio State Lottery Comm.* (1992), 63 Ohio St.3d 296, 299, 587 N.E.2d 290. Thus, this court will not disturb the trial court's decision unless it deemed to be an abuse of that discretion. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.

{¶ 63} Without a doubt, any evidence which points to the guilt of a defendant in a criminal case is prejudicial to the defense. *State v. West,* Cuyahoga App. No. 79404, 2002-Ohio-2242, 2002 WL 973089, ¶ 75. The pertinent inquiry is whether that evidence is *unduly* prejudicial. Here, the prosecution established that appellant purchased a .22–caliber Marlin bolt-action rifle from Glen Bradley on December 24, 2000. Bradley identified the weapon found by police as looking exactly like the weapon he had sold to appellant. The ballistics expert from BCI testified that the bullet fragments taken from the victim's brain had been fired from a Marlin rifle. The rifle was found on a path in between the murder scene and the appellant's residence, a path that contained footprints matching the size, style, and brand of shoe worn by appellant.

{¶ 64} Though circumstantial, this evidence was credible and sufficient to establish the relevancy of the rifle found by police. We do not find the probative value of the weapon to be outweighed by any prejudice to the appellant. Therefore, appellant's eighth assignment of error is overruled.

## IX

{¶ 65} On cross-appeal, the state submits one assignment of error contending that the trial court erred when it ordered the exclusion of four members of the victim's family from the courtroom until they could be excused as witnesses. Specifically, the state and its amici argue that the court violated R.C. 3930.09, which provides that the victim in a case may be present whenever the defendant is present during any stage of the case against the defendant that is conducted on the record, other than a grand jury proceeding, unless the court determines that exclusion of the victim is necessary to protect the defendant's right to a fair trial.

{¶ 66} Assuming, without deciding, that the state has standing to appeal the issue, that we have jurisdiction to hear the appeal, and that there would be some remedy available to the state should we decide in its favor, we find no error. R.C. 3930.09 clearly provides that a defendant's right to a fair trial remains superior to that of a victim's right to be present. Furthermore, the statute clearly gives a trial court the discretion to determine when the defendant's right to a fair trial would be at risk by the presence of a victim.

{¶ 67} The state argues that the trial court must be required to make specific findings, on the record, that allowing witnesses to be present would deny the defendant a fair trial. We submit that had the General Assembly intended this to be the law, it would have included language in the statute to provide for such a requirement. For the reasons stated, the state's cross-appeal is overruled.

{¶ 68} For the reasons stated it is the order of this court that the judgment of the Court of Common Pleas, Putnam County is hereby affirmed.

Judgment affirmed.

WALTERS and SHAW, JJ., concur.