OPINION
{¶ 1} Defendant-appellant, Rodney G. Watts, appeals the decision of the Butler County Court of Common Pleas convicting him of murder. We affirm the trial court's decision.
 {¶ 2} On the morning of December 14, 2004, the body of 26-year-old Carrie Roberts was discovered in the shower of her room at the Ranch Inn Motel in Middletown. She had been stabbed 13 times. Roberts checked into the Ranch Inn on December 11 and was assigned room 18. Upon arriving at the scene, officers from the Middletown Police Department examined the room, the body, and interviewed several of the motel's tenants. In the room, detectives observed three contact patterns of blood and a blood-stained comforter, but no evidence of a stabbing such as blood droplets or spatter were present.
 {¶ 3} Detectives wanted to speak with appellant as a potential witness because he was registered as the tenant in room 19. As a result, officers of the Middletown police were advised by dispatch to watch for appellant. The officers were also advised that appellant "had a suspended driver's license and a violent past; he had been to prison for shooting a subject and had several domestics for threatening to kill his significant other with a knife." Around 6:00 p.m. on December 14, two officers observed appellant driving on Verity Parkway. The officers initiated a traffic stop for driving on a suspended license and immediately informed the detectives that they had located appellant. Aware of appellant's violent past, an officer pulled his weapon for protection as he approached the vehicle, but the officer kept the weapon behind his back, out of sight, and never pointed it at appellant. After confirming appellant's identity, the officers requested he step out of the vehicle and placed him in handcuffs. The officers told appellant he was not under arrest, he was only being briefly detained until the detective arrived.
 {¶ 4} The detective arrived within five minutes of the traffic stop. The detective testified that he immediately removed the handcuffs and apologized to appellant for the inconvenience. He informed appellant that he had talked to other residents of the motel and asked if appellant would be willing to talk to him as a potential witness. The detective testified that he also stated to appellant that he was not under arrest and free to leave. Appellant agreed to speak with the detective and rode with the detective to the police station in the front seat of the police car without handcuffs. At the station, appellant was interviewed by two detectives while two other detectives observed in another room. As the interview progressed, the detectives discovered that appellant's story did not coincide with the other residents of the motel and changed several times. Around 9:00 p.m., after hearing appellant's multiple stories and inconsistencies, the detectives decided that he was a suspect and proceeded to read appellant hisMiranda rights. The detectives then confronted appellant about his inaccuracies and appellant once again changed his story. The officers continued to question appellant about the new version, but appellant ceased talking to the police. Appellant was placed under arrest for tampering with evidence and taken to the Butler County jail.
 {¶ 5} Following the interview, the detectives obtained and executed a search warrant on December 15 for appellant's motel room. In the room, the police discovered large bleed-out stains on the floor, blood stains on a table and under a chair, blood spatter and a pair of jeans and socks in the room with blood stains. The detectives sent samples of the evidence to the Miami Valley Regional Crime Lab for testing.
 {¶ 6} On March 3, 2005, appellant was indicted by a grand jury for murder, in violation of R.C. 2903.02(A). Prior to trial, appellant moved to suppress statements made to the police prior to receiving hisMiranda rights, which the trial court denied. Following a three-day trial, the jury found appellant guilty as charged. Appellant was sentenced to a mandatory term in prison of 15 years to life. Appellant timely appealed, raising two assignments of error.
 {¶ 7} Assignment of Error No. 1:
 {¶ 8} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT OVERRULED HIS MOTION TO SUPPRESS."
 {¶ 9} Appellant argues in his first assignment of error that the trial court erred by overruling his motion to suppress because the facts and circumstances indicate that appellant was not free to leave and a reasonable person would have believed he was under arrest.
 {¶ 10} An appellate court's review of a ruling on a motion to suppress presents a mixed question of law and fact. State v. Long (1998),127 Ohio App.3d 328, 332. When considering a motion to suppress, the trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate witness credibility.State v. Curry (1994), 95 Ohio App.3d 93, 96. As such, we accept the trial court's findings of fact so long as they are supported by competent, credible evidence. State v. Guysinger (1993),86 Ohio App.3d 592, 594. However, an appellate court independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, "whether as a matter of law, the facts meet the appropriate legal standard." Curry at 96.
 {¶ 11} "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege[.]" Miranda v. Arizona (1966), 384 U.S. 436, 478-479,86 U.S. 1602. The suspect must be advised prior to any questioning that he has the right to remain silent; that anything he says can be used against him in a court of law; that he has the right to the presence of an attorney; and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. Id. at 479.
 {¶ 12} Appellant argues the detention constituted an arrest because the police officer drew his weapon as he approached appellant's vehicle, appellant was placed in handcuffs, his freedom of movement was restricted, and he was never directly told that he did not have to go to the police station for the interview.
 {¶ 13} In this case, however, the police made a valid traffic stop after appellant was observed driving on Verity Parkway. The officers were aware that appellant had a suspended license. Appellant was detained in handcuffs while the officers conducted the investigative stop for driving with a suspended license. An investigative traffic stop does not require Miranda warnings because it is not an arrest. SeeBerkemer v. McCarthy (1984), 468 U.S. 420, 104 S.Ct. 3138. The detainment of appellant by placing him in handcuffs was also valid because police are "authorized to take steps as [are] reasonably necessary to protect their personal safety during the course of [a] stop." United States v. Hensley (1985), 469 U.S. 221, 235,105 S.Ct. 675. "Drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning * * * or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest forMiranda purposes." United States v. Leshuk (C.A.4, 1995) 65 F.3d 1105,1109, citing United States v. Moore (C.A.4, 1987), 817 F.2d 1105, 1108.
 {¶ 14} Appellant further argues the questioning by the detectives at the police station constituted custodial interrogation in violation ofMiranda.
 {¶ 15} The police are not required to issue Miranda warnings to everyone they question; rather they must issue such warnings only when they subject a suspect to "custodial interrogation." State v.Biros, 78 Ohio St.3d 426, 440, 1997-Ohio-204. "Custodial interrogation" is defined as questioning initiated by a law enforcement officer after a person has been taken into custody "or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. The determination of whether or not a custodial interrogation has occurred requires an inquiry into how a reasonable person in the suspect's position would have understood his situation; the ultimate question is whether there was a formal arrest of the suspect or restraint on the suspect's freedom of movement to a degree associated with a formal arrest. Biros, 78 Ohio St.3d at 440.
 {¶ 16} Spontaneous or voluntary statements are not considered the product of "custodial interrogation," and therefore are admissible even though Miranda warnings were not issued at the time they were made. SeeState v. Martin, 151 Ohio App.3d 605, 619, 2003-Ohio-735 (police were not required to take defendant into custody and issue Miranda warnings to him in order to question him about a murder, where defendant provided statements to police voluntarily and in a non-custodial setting). A person is not subject to a custodial interrogation requiringMiranda warnings where he was advised that he was not under arrest, voluntarily went to the police station, and then questioned. State v.Estes, Preble App. No. CA2005-02-001, 2005-Ohio-5478, ¶ 8, citingState v. Biros.
 {¶ 17} Det. Tom Lawson arrived within five minutes of the stop, immediately apologized for the inconvenience and removed appellant's handcuffs. He informed appellant that he spoke to the other motel tenants and asked to speak to appellant as a possible witness. Det. Lawson testified that he informed appellant that he was not under arrest and that he was free to leave. Appellant's decision to go to the police station was voluntary. Appellant rode in the front seat of the police cruiser without handcuffs. Also, during the interview at the station, appellant was given several breaks; whenever appellant asked for a break, for beverages, tobacco or to use the restroom, the detectives obliged his request.
 {¶ 18} Under these circumstances, no reasonable person in appellant's position would have believed that his freedom of movement was being restrained by the detectives to a degree associated with a formal arrest until the point at which appellant was placed under formal arrest and issued Miranda warnings to him. Biros, 78 Ohio St.3d at 440. Appellant was only a witness during the initial questioning at the police station. Therefore, all of the statements appellant made to the detectives before he was placed under formal arrest were not the product of custodial interrogation, and the detectives were not required to issueMiranda warnings to appellant before appellant made those statements in order for them to be deemed admissible. Id. The trial court did not err by overruling the motion to suppress. Appellant's first assignment of error is overruled.
 {¶ 19} Assignment of Error No. 2:
 {¶ 20} "THERE WAS INSUFFICIENT EVIDENCE TO JUSTIFY A CONVICTION FOR MURDER."
 {¶ 21} Appellant raises several arguments challenging the sufficiency of the evidence supporting his conviction. Specifically, appellant argues there was no direct evidence that he committed the murder.
 {¶ 22} In reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
 {¶ 23} Appellant was convicted of murder in violation of R.C.2903.02(A), which provides:
 {¶ 24} "No person shall purposely cause the death of another."
 {¶ 25} The requisite mental state is defined in R.C. 2901.22(A) as:
 {¶ 26} "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 27} Appellant argues there is "absolutely no direct evidence" that appellant murdered Carrie Roberts because no witness saw him commit any act of violence, no motive was established and appellant never implicated himself.
 {¶ 28} Iris Truett and Sharon Gloss, both tenants at the Ranch Inn on December 11, testified at the trial. Gloss stated that she was friends with appellant and had lived in room 12 for several months with her son and boyfriend. Truett stated that she had only been staying at the motel for few days with her boyfriend and three children. Both women testified that they were in Truett's room with appellant around 11:50 p.m. on December 11. They testified that Carrie Roberts entered the room and accused them of stealing her cigarettes. Roberts left the room, returning a few minutes later asking to borrow cigarettes. They testified that appellant stated that he had some cigarettes in his room and the pair left together. Appellant returned about 15 minutes later, stating that he was going to take Roberts to the store to buy cigarettes. Gloss requested that appellant buy her beer while he was out and gave him money, however, neither appellant nor Roberts returned to the room and were not seen for the rest of the night. Truett testified that she walked Gloss back to her room around 3:00 a.m. to put Gloss to bed because Gloss was drunk.
 {¶ 29} Gloss testified that around 8:00 p.m. the following day, she talked to appellant. She testified that appellant asked her, "Did you hear the racket next door (referring to Carrie Robert's room)? It sounded like somebody was killing somebody." Gloss testified that she told appellant that she did not hear anything. Appellant then claimed that he saw a black man run from the room after he heard the racket.
 {¶ 30} Ivor Roberts, Carrie Robert's father, testified that on December 11 he picked up his daughter in downtown Middletown and dropped her off at the Ranch Inn around 11:45 p.m. As he left, he observed appellant pull into the parking lot and park in front of his room at the motel.
 {¶ 31} Det. David Short of the Middletown Police Department testified. Det. Short led the collection of evidence at the scene on December 11 and the collection of evidence in appellant's room on December 15. He testified about the examination of the body and the absence of any blood spatter or blood droplets in the victim's room. He also testified about evidence collected from appellant's room on December 15 and that there was evidence on the sidewalk between rooms 18 and 19 where something had been dragged between the two. Finally, Det. Short stated that appellant was examined on December 17 and abrasions and lacerations that appeared to be claw marks were found on his left arm.
 {¶ 32} Det. David Schwartzel testified that he searched the dumpster of the Ranch Inn, where he discovered a bloody bracelet with Roberts' initials, a bloody sock and a bloody napkin. He also testified that he searched the room of Sharon Gloss and found no evidence.
 {¶ 33} Det. Frank Hensley testified that he observed the interview at the police station. Det. Hensley testified that appellant first claimed that he went to sleep around 10:00 p.m. on December 11 and did not hear any noises coming from room 18 that night. Det. Hensley stated that upon further questioning, appellant changed his story; stating that he went to his girlfriend's home around 11:30 p.m. and did not return to the motel until 12:30 because he was watching "Saturday Night Live," but could not remember what was on the show. After further police questioning, appellant changed his story once again claiming Carrie Roberts was a prostitute, that he gave her a ride to a different motel earlier that night, when he returned he witnessed her smoking crack with Sharon Gloss and he heard her arguing with a "black man" that night in her motel room.
 {¶ 34} After informing appellant of his Miranda rights, Det. Hensley testified that they confronted appellant about the inaccuracies and appellant changed his story once again, blaming the death on an argument over cigarettes. Appellant claimed that when he returned from his girlfriend's house around 11:45 that evening, he found Gloss in his room with Roberts dead on the floor. He claimed that Gloss killed Roberts following an argument over stolen cigarettes. Appellant then claimed that he only helped Gloss transport the body to the shower in the other room. Det. Hensley said appellant began to cry and then ceased talking about the incident.
 {¶ 35} Det. Hensley stated that on February 18, 2005, appellant informed the detectives that he wished to reinitiate discussions about the case. As a result, the detectives went to the Butler County jail to speak with appellant. At the jail, appellant reiterated that he was present when Roberts was killed, but Gloss killed her, and he only helped by putting the body in the shower.
 {¶ 36} Annette Davis, a forensic scientist employed at the Miami Valley Regional Crime Laboratory, testified that the blood found on appellant's boot matched the DNA profile of Roberts. Davis also testified that the blood on the items found in the dumpster, the bracelet, sock and napkin, matched Roberts. Davis stated the blood stains on the east wall of appellant's hotel room, on the carpet in appellant's room and on the socks in his room also matched Roberts. In addition, the table top in appellant's room contained Roberts' blood and appellant's blood. Finally, Davis testified that the material found under Roberts' fingernails was a combination of Roberts' own DNA and appellant's DNA. Davis testified the significance of that sample was that "you would expect to have the victim's DNA under her own fingernails * * * there was actually a large amount of DNA from the other individual to have an equal amount to the victim's."
 {¶ 37} Although much of the evidence against appellant is circumstantial, circumstantial evidence and direct evidence have the same probative value, and in some instances, certain facts can only be established by circumstantial evidence. State v. Jenks (1991),61 Ohio St.3d 259, 272. Moreover, a conviction based solely on circumstantial evidence is no less sound than one based on direct evidence. State v.Begley (Dec. 21, 1992), Butler App. No. CA92-05-076, 5.
 {¶ 38} The scientific evidence coupled with human observation demonstrated that appellant committed the crime. In the present case, the state presented evidence that demonstrated Carrie Roberts was killed in appellant's hotel room. Her blood was present on the walls, carpeting, table and bed in appellant's room and also on his clothing. Evidence also showed that the body was moved following the murder. Appellant was the last individual to be seen with Roberts. Also, when questioned, appellant's recollection of the evening was inconsistent with the other witnesses and changed multiple times.
 {¶ 39} After a review of the record, we believe there was sufficient evidence to find that appellant possessed the requisite mental state to commit murder. Viewing the evidence in a light most favorable to the state, a rational trier of fact could have found that appellant acted with specific intent to cause the death of Carrie Roberts. Accordingly, appellant's second assignment of error is overruled.
 {¶ 40} Judgment affirmed.
POWELL, P.J., and YOUNG, J., concur.