OPINION
{¶ 1} Appellant Brian K. Siler appeals from his conviction and sentence for murder in the Ashland County Court of Common Pleas. The appellee is the State of Ohio. The relevant facts leading to this appeal are as follows.
 {¶ 2} On Wednesday evening, September 19, 2001, appellant's wife Barbara Siler attended the Ashland County Fair with the couple's three-year-old son, Nathan, and her friend, Terrie. At that time, Nathan was in the custody of Barbara, who was estranged from appellant. According to Terrie, Barbara was happy and upbeat during the visit to the fair. However, in the early afternoon of Thursday, September 20, 2001, Barbara's body was discovered hanging by a yellow rope from an overhead door track in her garage. The victim's toes were touching the floor, but her heels were about an inch off the floor. Her body was covered with bruises and scrapes, including a large bruise to her vaginal area. The Ashland County Coroner, Dr. William Emery, was able to observe the body before it was taken down. Based on his assessment of rigor mortis, he calculated the time of death as between 4:00 AM and 6:00 AM Thursday morning. The Cuyahoga County Coroner's Office, which handled the autopsy, later reported the cause to be asphyxia from strangulation as a consequence of cervical compression.
 {¶ 3} In the preceding months, appellant and Barbara had experienced significant marital problems. During that period, appellant had remained upset about a terminated affair Barbara had carried on with one of her co-workers. Friends from the Silers' church had intervened to help the couple work through their problems. However, Barbara made arrangements for appellant to visit with Nathan at appellant's parents' home. Nonetheless, in late July, 2001, Barbara obtained a temporary protection order. At that point, appellant moved into the home of his brother, Kevin Siler, and his wife, also named Barbara.[1] On September 19, 2001, the night Barbara, Terrie, and Nathan visited the fair, appellant did some basement remodeling work with Kevin and then watched sports programming on TV with his brother. Appellant retired to the bedroom he was using in Kevin's house at about 9:30 PM that evening. Kevin then went to bed at about 12:30 AM, September 20, 2001. Kevin's wife arrived home from her evening-shift job at about 1:30 AM. She proceeded to do some work on her computer. She briefly spoke with appellant when he walked past her computer room at about 3:00 AM, on his way back from the bathroom.
 {¶ 4} Kevin's wife went to bed at about 4:00 AM. About fifteen minutes later, she awoke to sounds of banging and "clunking" from appellant's room. When she got up later, appellant and Kevin were gone from the house. Appellant claimed at trial that he drove to Columbus the morning of September 20th to interview for a potential job, then stopped in Mansfield, then returned to the Ashland County area.
 {¶ 5} At around noon on September 20, 2001, Barbara's father received a call from the management at Barbara's accounting job, indicating she had not reported for work. Barbara's father went to her residence. He noted the outside door into the garage was ajar, as was the door from the garage to the house. He could also see Barbara's van inside the garage, with its driver's door open. The sheriff's department was immediately contacted.
 {¶ 6} Deputy Singleton first arrived at the scene at about 1:45 PM. He discovered Barbara's body, and evidence of a forced opening of the outside door into the garage. After calling for back-up, Singleton went into the house and discovered Nathan asleep in his bed. Singleton took Nathan outside. Detective Larry Martin arrived soon thereafter. Both Singleton and Martin attempted to discuss with Nathan what he had observed, as further analyzed infra. The two officers thereafter went to Kevin's home to interview appellant. Appellant agreed to accompany them to the sheriff's office. Singleton observed that appellant's hands had red marks near each thumb and some of his fingers. Appellant also had scratch marks on top of some of his knuckles and on his chest, near his neck.
 {¶ 7} Appellant was subsequently charged with Barbara's murder, with a death penalty specification. The case proceeded to jury trial. Appellant filed a motion to exclude the out-of-court statements made by Nathan to the two officers, and renewed his objection at trial. The court permitted the statements under the "excited utterance" exception to hearsay. After Singleton's and Martin's testimony, appellant moved for a mistrial, which the trial court denied. The trial court further denied appellant's notice of alibi. However, appellant's expert pathologist, Dr. John Pless, testified that Barbara had hung herself.
 {¶ 8} The Ashland County Grand Jury handed down a seven-count indictment on December 12, 2001, including aggravated murder and child endangering. Following trial, the jury returned a verdict of guilty on all counts. Following a mitigation hearing on June 11, 2002, the jury recommended a sentence of death. Nonetheless, the trial court sentenced appellant to life in prison without parole.
 {¶ 9} On July 29, 2002, appellant filed a notice of appeal. He herein raises the following thirteen Assignments of Error:
 {¶ 10} "I. THE TRIAL COURT ERRED IN PERMITTING NATHAN SILER'S HEARSAY STATEMENTS TO LAW ENFORCEMENT PERSONNEL TO BE ADMITTED AS AN EXCITED UTTERANCE, THEREBY DEPRIVING MR. SILER OF HIS RIGHTS TO A FAIR TRIAL AND TO CONFRONT WITNESSES, AS GUARANTEED BY THE 5TH, 6TH AND14TH AMENDMENTS, U.S. CONST., AND SECTIONS 9, 10, AND 16 ART. I, OHIO CONST.
 {¶ 11} "II. PROSECUTORIAL MISCONDUCT DEPRIVED MR. SILER OF HIS CONSTITUTIONALLY GUARANTEED RIGHT TO A FAIR TRIAL, IN VIOLATION OF THE6TH AND 14TH AMENDMENTS, U.S. CONST., AND SECTION 10, ART. I, OHIO CONST.
 {¶ 12} "III. THE TRIAL COURT ERRED IN PERMITTING INTRODUCTION OF PREJUDICIAL CHARACTER EVIDENCE, THEREBY DENYING MR. SILER HIS RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THE 5TH AND 14TH AMENDMENTS, U.S. CONST., AND SECTIONS 10 AND 16, ART. I, OHIO CONST.
 {¶ 13} "IV. THE TRIAL COURT ERRED IN PERMITTING INTRODUCTION OF EVIDENCE OF PREJUDICIAL `OTHER ACTS,' THEREBY DENYING MR. SILER HIS RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THE 5TH AND 14TH AMENDMENTS, U.S. CONST., AND SECTIONS 10 AND 16, ART. I, OHIO CONST.
 {¶ 14} "V. THE TRIAL COURT ERRED IN PERMITTING INTRODUCTION OF TESTIMONY REGARDING SPECIFIC INSTANCES OF UNTRUTHFULNESS BY MR. SILER, THEREBY DENYING MR. SILER HIS RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THE 5TH AND 14TH AMENDMENTS, U.S. CONST., AND SECTIONS 10 AND 16, ART.I, OHIO CONST.
 {¶ 15} "VI. THE TRIAL COURT ERRED WHEN IT PERMITTED THE STATE TO IMPEACH ITS OWN WITNESS WHEN THE TESTIMONY WAS NOT INCONSISTENT WITH PRIOR STATEMENTS. 5TH AND 14TH AMENDMENTS, U.S. CONST. SECTIONS 9, 10, AND 16 ART. I, OHIO CONST.
 {¶ 16} "VII. WHEN TRIAL COUNSEL MOVES FOR PRODUCTION UNDER CRIM.R. 16(B)(1)(G) AND OBJECTS WHEN AN INCOMPLETE STATEMENT IS PRODUCED BY THE STATE, THE TRIAL COURT'S FAILURE TO ORDER THE STATE TO PRODUCE THE COMPLETE STATEMENT VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW. 5TH, 6TH, 14TH AMENDMENTS, U.S. CONST.; SECTIONS9, 10, AND 16, ART. I, OHIO CONST.
 {¶ 17} "VIII. THE TRIAL COURT ERRED WHEN IT DID NOT PERMIT TRIAL COUNSEL TO CROSS-EXAMINE DET. SMART WITH HIS OBSERVATION THAT APPELLANT `STARTED CRYING.' 5TH, 6TH, 14TH AMENDMENTS, U.S. CONST.; SECTIONS9, 10, AND 16, ART. I, OHIO CONST.
 {¶ 18} "IX. THE FAILURE TO PROVIDE DET. MARTIN'S POLICE REPORT OR INFORMATION PRE-TRIAL VIOLATED CRIM.R. 16(B)(1)(F) AND BRADY V. MARYLAND (1963), 373 U.S. 83.
 {¶ 19} "X. THE CUMULATIVE EFFECT OF THE INTRODUCTION OF NUMEROUS TYPES OF IMPROPER EVIDENCE DEPRIVED MR. SILER OF HIS RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THE 5TH AND 14TH AMENDMENTS, U.S. CONST. AND SECTIONS 10 AND 16, ART. I, OHIO CONST.
 {¶ 20} "XI. THE PERFORMANCE OF TRIAL COUNSEL WAS DEFICIENT, AND DEPRIVED MR. SILER OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE 6TH AND 14TH AMENDMENTS, U.S. CONST., AND SEC. 10, ART. I, OHIO CONST.
 {¶ 21} "XII. THE SENTENCING HEARING VIOLATED R.C. 2929.03 2929.04 AND DUE PROCESS OF LAW. 5TH 14TH AMENDMENTS, U.S. CONST.; SECTIONS 9, 10, AND 16, ART. I, OHIO CONST.
 {¶ 22} "XIII. DID THE TRIAL COURT IMPROPERLY INSTRUCT THE JURY THAT THE MENS REA FOR CHILD ENDANGERING UNDER R.C. 2919.22(B)(2) IS RECKLESSLY, THUS RESULTING IN APPELLANT'S CONVICTION ON INSUFFICIENT EVIDENCE? 5TH AND 14TH AMENDMENTS, U.S. CONST., AND SECTIONS 10 AND 16, ART. I, OHIO CONST.
 I. {¶ 23} In his First Assignment of Error, appellant argues the trial court erred by allowing testimony concerning out-of-court statements made by Nathan Siler, the child of the victim and appellant, under the "excited utterance" hearsay exception. We disagree.
 {¶ 24} The admission or exclusion of evidence rests in the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173,180. Our task is to look at the totality of the circumstances in the particular case under appeal, and determine whether the trial court acted unreasonably, arbitrarily or unconscionably in allowing or excluding the disputed evidence. State v. Oman (Feb. 14, 2000), Stark App. No. 1999CA00027. As a general rule, all relevant evidence is admissible. Evid.R. 402. However, under Evid.R. 802, hearsay evidence is not admissible, "except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio."
 {¶ 25} Evid.R. 803(2), an exception to the hearsay rule, provides: "Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In order to be admissible as an excited utterance under Evid.R. 803(2), "a statement must concern `some occurrence startling enough to produce a nervous excitement in the declarant,' which occurrence the declarant had an opportunity to observe, and must be made `before there had been time for such nervous excitement to lose a domination over his reflective faculties. * * * ' "State v. Huertas (1990), 51 Ohio St.3d 22, 31, quoting Potter v. Baker
(1955), 162 Ohio St. 488, paragraph two of the syllabus. In reviewing decisions of a trial court on excited-utterance exceptions, we note "[i]t is elementary that the trial judge is to decide those questions of fact which must be decided in order to determine whether certain evidence is admissible. * * * If his decision of those questions of fact, as reflected in his ruling on the admissibility of * * * [the] declaration, was a reasonable decision, an appellate court should not disturb it."State v. Wallace (1988), 37 Ohio St.3d 87, 90, quoting Potter v. Baker
(1955), 162 Ohio St. 488, 500.
 {¶ 26} In Wallace, supra, the Ohio Supreme Court also analyzed the impact of questioning the declarant under Evid.R. 803(2), holding as follows: "The admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." Id. at paragraph two of the syllabus.
 {¶ 27} Appellant contends the trial court's allowance of the child's statements made at the scene of the crime was erroneous under all three elements of Wallace, as well as the second element of State v.Duncan (1978), 53 Ohio St.2d 215, i.e., the requirement "that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs." Duncan, at paragraph 1(b) of the syllabus.
 {¶ 28} In the case sub judice, Deputy Singleton, shortly after responding to the garage at Barbara's home at approximately 1:45 PM on September 20, 2001, went into Nathan's bedroom and discovered the child sound asleep. Nathan, then age three, wore pajamas, but had apparently pushed away his bed coverings. Singleton managed to awaken Nathan, who looked a little startled. Tr. at 1752. Nathan said nothing at that point, but did not resist as Singleton picked him up. Singleton, who was familiar with the Siler family based on a previous domestic violence call in July 2001, thereupon asked Nathan if "daddy" had been there that day, to which Nathan replied "No." Singleton then took Nathan outside, making sure the child did not observe the scene in the garage as they passed through. Once outside, Nathan pointed back toward the garage and said, "Find Mommy." Tr. at 1730. Singleton thereafter returned to Nathan's room to get the child some more clothing, which he handed over to Barbara's father.
 {¶ 29} Detective Martin came upon the scene at about 2 PM. He testified at trial that he had received training in interviewing young children. At about 2:20 PM, Martin commenced an interview with Nathan in the front yard area. Martin stretched himself out on the ground so that Nathan would not have to look up at him while talking. At first the child appeared not to desire to talk to Martin, but eventually did so. According to Martin, Nathan did not appear to be nervous or in distress, was not excited, and was not upset. Tr. at 1826, 1828. Martin initially spoke with the child for about thirty to forty-five minutes. He asked Nathan some questions about the trip to the county fair the night before, then asked him if anything had scared him that night after returning home. Nathan told him, "Daddy did." Tr. at 1803. Martin then asked him how appellant had scared him, to which the child replied, "[k]nocking loudly." Id. When Martin asked him what he meant, Nathan jumped off of his grandfather's lap, where he had been sitting, and ran to the front door to demonstrate. Martin then asked Nathan if anything else had scared him. Nathan replied, "Daddy, mommy fighting." Id. When asked where this had occurred, Nathan said it had been in the garage. At this point, Nathan indicated he was hungry, and Martin also noted that Nathan was acting like he wanted to back into the house to find Barbara. Martin therefore agreed to let Terrie, Barbara's friend, take the child away from the area to get something to eat. Martin directed Terrie to forbid anyone from questioning the child during this period.
 {¶ 30} When Nathan was brought back to the yard after his meal at a Wendy's restaurant, he continued to be physically energetic. He also continued to desire to see his mother and reenter the house. Tr. at 1805-1806. At this point, Jenny Taylor, a children's services investigator, arrived at the scene. Martin re-traced some of his earlier questions concerning the previous night's events. He then asked if "anyone was hurting mommy" during the incident. Tr. at 1807. Nathan again stated, "Daddy did." Id. Martin then asked Nathan some questions using Taylor as a mock victim. Martin held Taylor in certain fighting positions, finally standing to the back of Taylor and putting his arm around her in a hold position. Martin then asked Nathan, "like that?" Tr. at 1810. Nathan replied "up." Id. Martin then moved his arm up towards Taylor's neck or throat area. At that point, Nathan said "yes," and started crying. Tr. at 1810.
 {¶ 31} The transcript of the trial at this juncture continues as follows:
 {¶ 32} "DETECTIVE MARTIN: I had told Nathan that I need to ask him just one more question.
 {¶ 33} "CHIEF ASSISTANT PROSECUTOR ROGERS: And before you get to that question, had you — had he said anything about something yellow and his mother?
 {¶ 34} "MARTIN: No.
 {¶ 35} "ROGERS: Had he indicated how she was sleeping upright in the garage?
 {¶ 36} "MARTIN: He did.
 {¶ 37} "ROGERS: Indicate to the jury what he said about that.
 {¶ 38} "MARTIN: That mommy — the yellow thing was holding mommy.
 {¶ 39} "ROGERS: "So then you tell him at some point that you're going to only ask him one more question because he's starting to cry?
 {¶ 40} "MARTIN: Correct.
 {¶ 41} "ROGERS: Did you ask him that one more question?
 {¶ 42} "MARTIN: I did.
 {¶ 43} "ROGERS: "What question did you ask Nathan Siler?
 {¶ 44} "MARTIN: Who put the yellow thing around mommy.
 {¶ 45} "ROGERS: Did Nathan Siler answer you after you asked him who put the yellow thing around his mother?
 {¶ 46} "MARTIN: He did.
 {¶ 47} "ROGERS: What did he answer?
 {¶ 48} "MARTIN: Daddy.
 {¶ 49} "ROGERS: After he said that, what did Nathan start to do?
 {¶ 50} "MARTIN: Crying.
 {¶ 51} "ROGERS: Did he want anything?
 {¶ 52} "MARTIN: No. He wanted — he wanted his mommy, and at that point I didn't continue to ask him more questions." Tr. at 1810-1811.
 {¶ 53} Appellant correctly notes that as much as eight hours passed between the estimated time of Barbara's death and Nathan's statements to the officers. Moreover, Nathan made most of his statements to Martin, the second officer. Martin recalled on cross-examination that his first interview with Nathan lasted about thirty to forty-five minutes, followed by a break for the child to eat, followed by the second interview immediately thereafter of about one hour. Tr. at 1824-1825. The child's statement about appellant's use of the "yellow thing," i.e., the rope, came at the end of the questioning. On the other hand, the recollection of the rope caused the child to cry, and throughout the interview, he frequently shifted his attention back to the house where he felt his mother should be. Certainly, " * * * as the time between the event and the statement increases, so does the reluctance to find the statement an excited utterance." Duncan at 219, quoting McCormick On Evidence (2 Ed. 1972) 706, Section 297. However, in State v. Taylor
(1993), 66 Ohio St.3d 295, 303, 612 N.E.2d 316, the Ohio Supreme Court noted that "[t]here is no per se amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought." (Emphasis omitted.)
 {¶ 54} As we recently noted in In re Rossantelli, Delaware App. No. 01CAF12072, 2002-Ohio-2525, the Ohio Supreme Court has emphasized " * * * an appellate court should allow a wide discretion in the trial court to determine whether in fact a declarant was at the time of an offered statement still under the influence of an exciting event." Duncan at 219. In analyzing an Evid.R. 803(2) issue involving a four-year-old declarant, the Eleventh District Court of Appeals opined: "When the statements are those of *** a child of tender years, the lapse of time between the event and the declaration has been expended [sic], thus recognizing the reality that `a child victim of a crime may be under stress caused by the events for a longer period of time than adults.' "State v. Reed (May 31, 1991), Lake App. No. 89-L-14-130, quoting Statev. Kunsman (Mar. 30, 1984), Lake App. No. 9-252, at 6.
 {¶ 55} We agree with the state's assertion that a small child who has witnessed his mother's death is unlikely to quickly overcome the shock. Based on our review of the record, we find the trial court acted within its discretion in its implicit conclusions that Nathan was still under the stress of the previous night's domestic violence and the grisly scene in the garage.
 {¶ 56} Appellant additionally cites State v. Terra (1991),74 Ohio App.3d 189, for the proposition that "[f]or an excited utterance of a child of tender years to be admissible (whether or not elicited by questioning), the evidence must indicate that the child possesses sufficient intelligence to render his or her statement reliable, notwithstanding his incompetency to testify at trial." Id. at 197. This is in apparent reference to appellant's unsuccessful attempt to obtain a separate pretrial evidentiary hearing on the admissibility of the potential 803(2) hearsay statements of Nathan. See Defense Motion 53, April 15, 2002. However, appellant has provided no clear authority that such a hearing is mandated under the circumstances of the case sub judice. Moreover, upon review of the record as to the issue of declarant reliability, we find the evidence supports a conclusion that the officers' interviews with Nathan were within the bounds of the three-part test of Wallace, supra.
 {¶ 57} Therefore, appellant's arguments regarding the admission of Nathan's statements made on the day of the crime scene investigation are without merit. Appellant's First Assignment of Error is overruled.
 II. {¶ 58} In his Second Assignment of Error, appellant contends that prosecutorial misconduct deprived him of a fair trial. We disagree.
 {¶ 59} The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. State v. Lott (1990), 51 Ohio St.3d 160, 555 N.E.2d 293. In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained of conduct in the context of the entire trial.Darden v. Wainwright (1986), 477 U.S. 168, 91 L.Ed.2d 144,106 S.Ct. 2464. A defendant's failure to object at trial to alleged prosecutorial misconduct waives all but plain error. State v. Braden (2003),98 Ohio St.3d 354, 369.
 Closing Argument Issues {¶ 60} Appellant first contends the prosecutor made impermissible comments to the jury regarding appellant's character during closing arguments. Specifically, he directs us to the following prosecutorial references: "his desire to be viewed as a victim" T.3051; "don't forget the other times he boo-hooed" T.3054; "[w]e know he loves the limelight" T.3061; [w]e know he's obsessive and controlling and competitive and angry" T.3061; "he's addicted to pornography" T.3062; "[h]e's a poor father" T.3063; "if his mouth is open, there's a lie coming out." T.3063; "[w]hat else do we know besides he craves the limelight and he's a liar?" T.3066; "[w]hat else do we know besides he loves the limelight, he's a liar, and he's obsessive? Well, we know he's controlling." T.3067; "[i]n addition to loving the limelight, a liar, obsessive and controlling, he's competitive." T.3068; "[f]inally, we know he's angry." T. 3069.
 {¶ 61} Appellant next contends the prosecutor mischaracterized evidence during closing. For example, appellant points out that the prosecutor incorrectly asserted to the jury that the defense forensic expert, Dr. John Pless, in forming his opinion as to the suicide cause of death, did not know about the forced entry into the Siler garage. Tr. at 3038; cf. Tr. at 2813. Secondly, the prosecutor described Nathan's "critical statement" as having been made "immediately after he first sees the first adult after his mother's murder." Tr. at 3039. As we noted in our analysis of appellant's First Assignment of Error, the child made the bulk of his specific statements to Martin, the second officer, at which point he had already been in the presence of his grandfather and Terrie Cato. Additionally, appellant challenges the prosecutor's comments concerning appellant being a "poor father" and references to appellant leaving his DNA on the knots of the hanging rope. Finally, appellant challenges what he considers improper conjecture created during closing. He contrasts the prosecutor's allegation that appellant threw out the clothing he was wearing on the night in question with Detective Smart's conclusion that he had no reason to believe appellant misrepresented anything about his clothing. Appellant also contrasts the prosecutor's assertion that he "left at the scene a scalp hair" (Tr. at 3078) with a forensic specialist's testimony that there was no way to determine how long such hairs had been on the garage floor. Finally, appellant challenges the prosecutor's statement that Nathan "sat by the beaten body of his lifeless mother. No question that as he sits there, asking her and begging her to wake up, that blood and saliva drips from her tongue as it protrudes and blackens in front of [him]." Tr. at 3078.
 Pre-trial and Opening Statement Issues {¶ 62} Appellant also alleges prosecutorial misconduct earlier in the case. He notes defense counsel told the court at a May 1, 2002 pretrial that some of the police officers had been instructed by the State not to talk to appellant's attorneys, a charge the prosecutor denied. Defense counsel then played a tape of a phone message purportedly left by one of the detectives in which he stated an assistant prosecutor instructed him "no deposition or talking about the case," which he allegedly relayed to other officers. Tr., Pre-trial, at 30-31. In regard to opening statements, appellant accuses the prosecutor of implying guilt because of the mere existence of the indictment. Appellant further claims the prosecutor made improper references to appellant being "infuriated" about the sheriff department's earlier intervention in his marriage due to domestic violence concerns, as well as references to appellant's unemployed status as of the time of the crime.[2]
 {¶ 63} We note a prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394. Furthermore, a wide latitude is allowed for a prosecutor in closing argument. State v. Bies (1996), 74 Ohio St.3d 320, 326. In the context of the entire transcript, we are unpersuaded by appellant's arguments. We find the prosecutor's overall comments consistent with the record of the testimony and directed to the strength of the case. State v. Ginley
(Sept. 27, 2000), Lorain App. No. 99CA007423. Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. State v. Braden (2003), 98 Ohio St.3d 354, 370, citingDonnelly v. DeChristoforo (1974), 416 U.S. 637, 646-647.
 {¶ 64} We do not find the existence of prosecutorial misconduct under the facts and circumstances of the case sub judice. Appellant's Second Assignment of Error is overruled.
 III., IV. {¶ 65} In his Third Assignment of Error, appellant contends the trial court deprived him of due process by allowing the introduction of prejudicial character evidence. In his Fourth Assignment of Error, appellant challenges the introduction of alleged "other acts" evidence against him. We disagree.
 {¶ 66} Evid.R. 404(A) provides that evidence of a person's character is not admissible to prove the person acted in conformity with that character. Evid.R. 404(B) sets forth an exception to the general rule against admitting evidence of a person's other bad acts. The Rule states as follows: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 67} Appellant specifically raises a 404(A) challenge to the following witnesses and their testimony: (1) William Harvey, the victim's employer, who described appellant as "an emotional kind of guy" who "would get fired up pretty quick" (Tr. at 1641, 1642); (2) Annette Naumoff, Nathan's guardian ad litem, who found appellant "nervous" during a custody interview two days before Barbara's death (Tr. at 2087); (3) Linda Cline, appellant's former employer, who described appellant as "high strung" and having "listening problems," and who noted that appellant asked her to deliver the bad news about his job termination to Barbara (Tr. at 2229, 2231); (4) Joe Steward, a friend of appellant, who characterized his demeanor as going from "high to low," and who referenced a dispute between appellant and Barbara over pornography in the home (Tr. at 2417, 2443); and (5) the cross examination of appellant himself, particularly as to appellant's interest in pornography and information from appellant's 2001 church-sponsored marital counseling, including appellant's self-assessment of his marital faults (Tr. at 2635-2640).
 {¶ 68} Appellant next challenges the following other acts evidence: (1) Linda Cline's testimony that appellant had once taken Barbara's cell phone (Tr. at 2230); (2) Terrie Cato's recollection that appellant once asked her to take Barbara from the house, calling her a "whore" (Tr. at 2158); (3) co-worker Lenora Kinney's statement that appellant came to Barbara's office building on the day he was terminated from his job in June 2001, pounding on the rear door (Tr. at 2246-2251); and (4) Joe Steward's recollection of a phone conversation he had held with Barbara, wherein he heard appellant swearing in the background at Barbara (Tr. at 2417-2418).
 {¶ 69} The record in the case sub judice reveals little or no objection to the testimony and/or questions cited by appellant in this Assignment of Error. It is well-established that an appellate court will generally not consider any error which a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. State v. 1981 Dodge Ram Van (1988), 36 Ohio St.3d 168,170, 522 N.E.2d 524. Error not raised in the trial court must be plain error in order to reverse. State v. Johnson (Nov. 19, 1998), Richland App. No. 98-CA-42, citing State vs. Long (1978), 53 Ohio St.2d 91, 7 Ohio Op.3d 178, 372 N.E.2d 804. Notice of plain error is to be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. Id. Plain error does not exist unless but for the error, the outcome of the trial would clearly have been otherwise. State vs. Nicholas (1993), 66 Ohio St.3d 431, 613 N.E.2d 225. We note a number of the alleged errors cited by appellant can be traced back to evidence of his marital problems with Barbara, a matter we find directly relevant to whether he had a motive to kill her. See State v.McCrady (December 18, 1998), Washington App. No. 97CA33. Upon review, we find appellant has failed to demonstrate an abuse of discretion or plain error in regard to the evidentiary decisions of the trial court under Evid.R. 404(A) and (B).
 {¶ 70} Appellant's Third and Fourth Assignments of Error are overruled.
 V. {¶ 71} In his Fifth Assignment of Error, appellant argues the trial court impermissibly allowed evidence of appellant's past specific instances of untruth. We disagree.
 {¶ 72} In response to a question asked by the State, Christine Box, a friend of appellant and Barbara, testified that appellant asked her to help him in the summer of 2001 by "holding him accountable" if she thought he was lying to her or her husband. The State also asked questions of Pete Cato, Terrie Cato, and Joe Steward about appellant lying to them about an incident wherein appellant had falsely accused Barbara of stealing his toy tractor collection. Appellant for the first time raises the argument that such testimony is violative of Evid.R. 608, which provides that the "credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but *** the evidence may refer only to character for truthfulness or untruthfulness." As per our discussion in appellant's Third and Fourth Assignments of Error, supra, we are disinclined to find reversible plain error regarding the aforesaid testimony.
 {¶ 73} Appellant's Fifth Assignment of Error is overruled.
 VI. {¶ 74} In his Sixth Assignment of Error, appellant argues the trial court improperly permitted the State to impeach one of its own witnesses. We disagree.
 {¶ 75} Appellant focuses on a portion of testimony by Kevin Siler's wife (appellant's sister-in-law), a State's witness. As noted hereinbefore, Mrs. Siler testified she went to bed about 4 AM, leaving the television on as she went to sleep. She then recalled that about fifteen minutes after going to bed, she heard a clunking sound coming from the room in which appellant was temporarily staying. Tr. at 2113-2114. At that point in the trial, the court permitted the State to question Mrs. Siler concerning her grand jury testimony, where she had testified she heard the noise in a less specific time frame, i.e., between 4 AM and 5 AM.
 {¶ 76} Evid.R. 607(A) allows a party calling a witness to attack the witness's credibility "by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." In the case sub judice, the coroner's estimated time of death was between 4 AM and 6 AM, and Barbara's body was not discovered until early afternoon. Notwithstanding the issue of whether surprise and affirmative damage were demonstrated by the prosecutor at trial, in light of the above time factors, we are unpersuaded that the assigned error was more than harmless. See State v. Blair (1986), 34 Ohio App.3d 6, 9.
 {¶ 77} Accordingly, appellant's Sixth Assignment of Error is overruled.
 VII. {¶ 78} In his Seventh Assignment of Error, appellant argues the trial court erred by failing to require the State to fully produce certain discovery materials. We disagree.
 {¶ 79} Detective Martin testified as to his interview with the child witness, Nathan Siler (see Assignment of Error I). At the close of the direct examination of Martin, appellant's trial counsel reviewed Martin's twenty-line witness statement, then cross-examined the officer. Martin testified he had not taped his interview with Nathan, but that he had reviewed "the actual case file that [he] sat down and typed up." Tr. at 1830-1831. Defense counsel moved for further review, which the trial court denied without reviewing Martin's full report.
 {¶ 80} Pursuant to Crim.R. 16, where there has been a demand for an in camera inspection of a witness' statement, it is mandatory that the court grant the defendant's motion for an inspection. Cleveland v.Austin (1978), 55 Ohio App.2d 215, 9 Ohio Op.3d 368, 380 N.E.2d 1357. The defendant, however, is not entitled to discovery of all reports. Statev. Smith (1976), 50 Ohio App.2d 183, 4 Ohio Op.3d 160, 362 N.E.2d 1239.
 {¶ 81} Criminal Rule 16(B)(1)(g) states, in pertinent part:
 {¶ 82} "(B) Disclosure of Evidence by the Prosecuting Attorney.
 {¶ 83} "(1) Information subject to disclosure.
 * * * {¶ 84} "(g) In camera inspection of witness' statement. Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement." ***
 {¶ 85} Appellant appears to argue that because the trial court ordered the prosecutor to deliver witness statements to the court, appellant necessarily had a right under Crim.R. 16(B)(1)(g) to view said statements in advance of the trial. We find no merit in this position. Moreover, according to the Ohio Supreme Court: "Those portions [of a testifying police officer's signed report] which recite matters beyond the witness' personal observations, such as notes regarding another witness' statement or the officer's investigative decisions, interpretations and interpolations, are privileged and excluded from discovery under Crim.R. 16(B)(2)." State v. Jenkins (1984),15 Ohio St.3d 164, 225.
 {¶ 86} Accordingly, appellant's Seventh Assignment of Error is overruled.
 VIII. {¶ 87} In his Eighth Assignment of Error, appellant argues the trial court erred in curtailing defense cross-examination of the officer who interviewed appellant at the police station. We disagree.
 {¶ 88} During the direct examination of Detective Smart, who met with appellant in the police interview room, the prosecutor asked the officer about what the State termed appellant's "purported crying" at points during his talk with police. Tr. at 2313. Smart subsequently responded that he had seen no tears streaming down appellant's face. However, despite Smart's witness statement indication that he had seen appellant crying, the trial court disallowed further cross-examination on the subject, on the basis that "the [video]tape [of appellant while in the interview room] will speak for itself in that regard." Tr. at 2322.
 {¶ 89} An appellate court may not reverse a trial court's decision with respect to the scope of cross-examination absent an abuse of discretion. Calderon v. Sharkey (1982), 70 Ohio St.2d 218. Although appellant contends the trial court was mistaken in assuming the videotape of appellant in the interview room would clarify the matter for the jury, we are unpersuaded the court's decision to move the trial along in this regard constituted an abuse of discretion.
 {¶ 90} Accordingly, appellant's Eighth Assignment of Error is overruled.
 IX. {¶ 91} In his Ninth Assignment of Error, appellant argues the trial court erred in failing to require provision of Detective Martin's full police report to the defense prior to trial. We disagree.
 {¶ 92} In Brady v. Maryland (1963), 373 U.S. 83, the United States Supreme Court held that the "[s]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a violation, a defendant must prove that the prosecution failed to disclose evidence upon request, the evidence was favorable to the defense, and the evidence was material. State v. Garn (Feb. 21, 2003), Richland App. No. 02CA45, citing Moore v. Illinois (1972), 408 U.S. 786.
 {¶ 93} Appellant in essence suggests that information concerning Martin's interview techniques with Nathan Siler was exculpatory as impacting the child's credibility, further urging that Nathan's excited utterances brought out by Martin functioned as the "linchpin" of the State's case. This Court has thoroughly assessed the testimony of Detective Martin at several points in this appeal, and we herein find appellant's claim of a Brady violation in regard thereto without merit under the facts and circumstances of this case.
 {¶ 94} Appellant's Ninth Assignment of Error is overruled.
 X. {¶ 95} In his Tenth Assignment of Error, appellant contends the trial court made cumulative errors warranting reversal. We disagree.
 {¶ 96} The doctrine of cumulative error provides that a conviction will be reversed where the cumulative effect of evidentiary errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal. State v. DeMarco (1987),31 Ohio St.3d 191, paragraph two of the syllabus.
 {¶ 97} In support of his argument, appellant directs to the assigned evidentiary errors raised earlier in this appeal, and in particular emphasizes the following: (1) Detective Martin's testimony concerning Nathan's statements on September 20, 2001; (2) the "voluminous evidence" regarding appellant's character; (3) the alleged prior bad acts evidence regarding appellant; and (4) evidence of prior untruthful statements by appellant. Appellant's Brief at 27. Appellant correctly notes this Court's past reluctance to embrace cumulative error as grounds for reversal, see State v. Mascarella (June 30, 1995), Tuscarawas App. No. 93AP100075; however, we have reviewed the relevant record in this matter and find reversible error has not been demonstrated.
 {¶ 98} Appellant's Tenth Assignment of Error is therefore overruled.
 XI. {¶ 99} In his Eleventh Assignment of Error, appellant argues he was deprived of the effective assistance of counsel at trial. We disagree.
 {¶ 100} Our standard of review is set forth in Strickland v.Washington (1984), 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052. Ohio adopted this standard in the case of State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373. These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel. First, we must determine whether counsel's assistance was ineffective; whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. Id. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie (1998),81 Ohio St.3d 673, 675, 693 N.E.2d 267.
 {¶ 101} Appellant raises the following areas of alleged ineffective assistance: (1) failure to object to alleged improper evidence as detailed in Assignments of Error III, IV, and V; (2) failure to suppress papers seized by the police during their execution of a warrant for shoes, rope, and clothing; (3) failure to suppress the search of appellant's computer; (4) failure to protect appellant's church-sponsored marital counseling documents under clergy-penitent privilege; and (5) failure to object during the prosecutor's closing arguments.
 {¶ 102} We note the record reveals dozens of pre-trial motions filed by appellant's trial counsel, including two separate well-fought attempts to strike the alleged hearsay statements of Nathan Siler, following which appellant's defense counsel moved for a mistrial. Upon review of the record, we are unpersuaded that trial counsel failed to provide reasonable representation on the above points. Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance. State v. Carter (1995),72 Ohio St.3d 545, 558, 1995 Ohio 104, 651 N.E.2d 965. It is likewise true that declining to object to a closing argument is often a reasonable tactical choice. See, e.g., State v. Murphy (2001), 91 Ohio St.3d 516,539; State v. Williams (2003), 99 Ohio St.3d 493, 516.
 {¶ 103} We find appellant was not deprived of the effective assistance of trial counsel. Appellant's Eleventh Assignment of Error is therefore overruled.
 XII. {¶ 104} In his Twelfth Assignment of Error, appellant argues his sentencing hearing violated R.C. 2929.03 and 2929.04. Appellant's argument is without merit. Because he was not sentenced to death, we find appellant has failed to demonstrate prejudice in regard to the application of the cited statutes. See, e.g., State v. Strub (1975), 48 Ohio App.2d 57,65; State v. Gresham (Aug. 10, 1989), Franklin App. No. 88 AP 792.
 {¶ 105} Appellant's Twelfth Assignment of Error is therefore overruled.
 XIII. {¶ 106} In his Thirteenth Assignment of Error, appellant argues the trial court erred in instructing the jury regarding the mens rea
component of his conviction for child endangering. We disagree.
 {¶ 107} R.C. 2919.22(B)(2) reads as follows:
 {¶ 108} "(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:
 {¶ 109} "(1) Abuse the child;
 {¶ 110} "(2) Torture or cruelly abuse the child;"
 {¶ 111} The trial court issued the following instruction regarding the charge at issue:
 {¶ 112} "Endangering children. The defendant is charged with endangering children. Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about the 19th or 20th day of September 2001, in Ashland County, Ohio, the defendant recklessly, cruelly abused a child. Child means a person under 18 years of age.
 {¶ 113} Abuse. Abuse means any act which causes physical or mental injury that harms or threatens to harm the child's health or welfare.
 {¶ 114} Cruelly means the deliberate infliction of pain and suffering upon the body or the feeling and emotions of another." Tr. at 3139.
 {¶ 115} The record indicates that appellant did not object to the above instruction. Tr. at 3149. Thus, we must analyze this argument under a plain error analysis. State v. Roberson (Dec. 18, 2000), Stark App. No. 1999CA00291. In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. Notice of plain error must be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v.D'Ambrosio (1993), 67 Ohio St.3d 424, 427; State v. Long (1978),53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 116} The evidence at trial supported a finding that appellant left his young child alone in a house with his mother's corpse for as long as eight to ten hours. Upon review, we are disinclined to apply the doctrine of plain error regarding the cited jury instruction. Appellant's Thirteenth Assignment of Error is overruled.
 {¶ 117} For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Ashland County, Ohio, is hereby affirmed.
By: Wise, J., Hoffman, P.J., and Boggins, J., concur.
[1] For the purpose of clarity, appellant's sister-in-law will be referred to as "Kevin's wife" or "Mrs. Siler" in this opinion.
[2] Appellant also cites certain evidentiary-related issues as indicative of prosecutorial misconduct. Most of these are addressed in subsequent Assignments of Error in this opinion.