The STATE of Ohio, Appellee,

v.

SILER, Appellant.

[Cite as *State v. Siler*, 164 Ohio App.3d 680, 2005-Ohio-6591.]

Court of Appeals of Ohio,
Fifth District, Ashland County.

No. 02 COA 028.

Decided Dec. 13, 2005.

Ramona Francesconi Rogers, Ashland County Prosecutor, for appellee.

David H. Bodiker, State Public Defender, Jill E. Stone and Craig Jaquith, Assistant State Public Defenders, for appellant.

Wise, Judge.

{¶ 1} Pursuant to a remand order from the United States Supreme Court, we herein reconsider appellant Brian K. Siler's appeal from his conviction and sentence for murder in the Court of Common Pleas, Ashland County, Ohio. The appellee is the state of Ohio. The relevant procedural facts leading to this appeal are as follows.

{¶ 2} In the early afternoon of Thursday, September 20, 2001, the body of Barbara Siler, the estranged wife of appellant, was discovered hanging by a rope from an overhead door track in her garage in Ashland, Ohio. Nathan Siler, the three-year-old son of appellant and Barbara, was found sleeping in another room. On December 12, 2001, the Ashland County Grand Jury handed down a seven-count indictment against appellant, including aggravated murder and child endangering. Following a five-day trial, the jury returned a verdict of guilty on all counts. Following a mitigation hearing on June 11, 2002, the jury recommended a sentence of death. Nonetheless, the trial court sentenced appellant to life in prison without parole. On July 29, 2002, appellant filed a notice of appeal, raising 13 assignments of error. On October 24, 2003, this court affirmed the conviction and sentence, holding inter alia that the trial court did not commit reversible error in allowing Ashland County Sheriff's Detective Larry Martin's testimony

concerning Nathan Siler's statements made to him on September 20, 2001, as excited utterances under Evid.R. 803(2). See *State v. Siler*, Ashland App. No. 02COA028, 2003-Ohio-5749, 2003 WL 22429053 (*"Siler I"*).

{¶3} The Ohio Supreme Court thereafter declined to accept review of appellant's case. See *State v. Siler*, 101 Ohio St.3d 1489, 2004-Ohio-1293, 805 N.E.2d 539. The court thereafter also denied reconsideration of that decision. See *State v. Siler*, 102 Ohio St.3d 1462, 2004-Ohio-2569, 809 N.E.2d 34.

{¶4} Appellant then filed a petition for a writ of certiorari with the United States Supreme Court. On December 6, 2004, the United States Supreme Court ordered that the judgment be vacated and that the cause be remanded to this court for further consideration in light of *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. See *Siler v. Ohio* (2004), 543 U.S. 1019, 125 S.Ct. 671, 160 L.Ed.2d 494.

{¶5} Accordingly, appellant herein sets forth the following sole assignment of error:

{¶6} "I. The trial court erred in permitting Nathan Siler's hearsay statements to Detective Martin to be admitted as excited utterances, thereby depriving Mr. Siler of his right to confront witnesses, as guaranteed by the 6th and 14th Amendments, U.S. Constitution."

I

{¶7} In his sole assignment of error, appellant argues that the trial court allowance of police testimony concerning out-of-court statements made by the child of the victim and appellant deprived appellant of his constitutional right to confront witnesses guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. In light of *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, we agree.

{¶8} In *Crawford*, the United States Supreme Court held that testimonial statements of a witness who does not appear at trial may not be admitted or used against a criminal defendant unless the declarant is unavailable to testify and the defendant has had a prior opportunity for cross-examination. The remand in the case sub judice from the United States Supreme Court solely directs us to reconsider our prior decision "in light of *Crawford.*" See *Siler v. Ohio* (2004), 543 U.S. 1019, 125 S.Ct. 671, 160 L.Ed.2d 494. Thus, the pressing question before us is whether the child's statements to Detective Martin were "testimonial." If we should answer that question in the affirmative, we would then proceed to consider whether the child was unavailable and whether defense counsel had been given a prior opportunity to cross-examine him. We would also proceed to a consideration of whether the allowance of the statements constituted mere harmless

error. If, on the other hand, we were to conclude that the child's statements are nontestimonial, we would be compelled to affirm appellant's conviction, because we have previously determined that the trial court did not abuse its discretion in allowing them into evidence as "excited utterances" under Evid.R. 803(2).

{¶ 9} *Crawford* does not provide a precise definition of "testimonial" evidence. On the one hand, the Supreme Court recited one definition as "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id., 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177, citing Brief for National Association of Criminal Defense Lawyers et al. as Amici Curiae 3. Since in the case sub judice we are dealing with a young child witness, we are confronted with the question of whether any three-year-old child witness would ever have the intellectual maturity to understand that his statements to an officer were going to be used in a later trial, as would an objective adult. Indeed, "[c]ourts around the nation have struggled with the application of *Crawford* to child witnesses, particularly how courts should apply the [aforesaid] concept * * * or whether the proper test should be objective or subjective in nature." *Lagunas v. State* (Aug. 26, 2005), Tex.App.-Austin No. 03–03–00566–CR, 2005 WL 2043678, —— S.W.3d ——. Ohio appellate courts have recognized that younger children have lesser reflective capabilities. See, e.g., *State v. Wagner* (1986), 30 Ohio App.3d 261, 30 OBR 458, 508 N.E.2d 164. In a related vein, it is generally recognized that admissions and confessions of juveniles require special attention. See *In re Harris* (June 7, 2000), Tuscarawas App. No.1999AP030013, 2000 WL 748087, citing *Haley v. Ohio* (1948), 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224. Obviously, the Confrontation Clause on its face makes no distinction as to the age of the witness. However, the Supreme Court, in addressing "hearsay exception" statements by young children, has also indicated (although before *Crawford*) that "[t]o exclude such probative statements under the strictures of the Confrontation Clause would be the height of wrongheadedness, given that the Confrontation Clause has as a basic purpose the promotion of the 'integrity of the factfinding process.'" *White v. Illinois* (1992), 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848, quoting *Coy v. Iowa* (1988), 487 U.S. 1012, 1020, 108 S.Ct. 2798, 101 L.Ed.2d 857.

{¶ 10} On the other hand, the vexing questions of the present case cannot escape the plain fact that the Supreme Court in *Crawford* did set forth several concrete examples of "testimonial" evidence: "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. "The Court noted these practices bore the closest kinship to the abuses at which the Confrontation Clause was directed, to

wit ex parte examinations of witnesses by justices of the peace." *State v. Williams,* Montgomery App. No. 20368, 2005-Ohio-213, 2005 WL 120054, ¶ 19. This becomes our main subquestion; in other words, did Detective Martin's interview of the child constitute an "interrogation" of a witness?

{¶ 11} We first observe that the Supreme Court used the term "interrogation" in its "colloquial, rather than any technical legal, sense." See *Crawford,* 541 U.S. at 53, 124 S.Ct. 1354, 158 L.Ed.2d 177, at fn. 4. We also note that the court consistently utilized the term "interrogation" in the opinion rather than "interview" or "questioning." At first blush, one might easily conceive of "interrogation" as police questioning involving an actual suspect, which was clearly not the case in the present appeal. Black's Law Dictionary has defined the term as a "process of questions propounded by police to person arrested or suspected to seek solution of crime." Black's Law Dictionary (5 Ed.1979) 734. However, the *Crawford* court, in its analysis of the roots of the Confrontation Clause and the dangers it was designed to prevent, noted that the courts of England at certain times in history adopted elements of the continental civil-law practice, and therefore "[j]ustices of the peace or other officials examined suspects *and* witnesses before trial." (Emphasis added.) *Crawford,* 541 U.S. at 43, 124 S.Ct. 1354, 158 L.Ed.2d 177. Furthermore, "[t]here is no requirement that a peace officer take someone into custody as a prerequisite to interrogating him." *State v. Martin* (2003), 151 Ohio App.3d 605, 619, 784 N.E.2d 1237. Hence, we conclude that "interrogation" as defined in *Crawford* applies to questioning of both suspects and witnesses.

{¶ 12} The *Crawford* court further observed that "[j]ust as various definitions of 'testimonial' exist, one can imagine various definitions of 'interrogation' * * *." *Crawford,* 541 U.S. at 53, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 4. The court therein declined to further select a definition, because under the facts of that case, the recorded statement made to police by Michael Crawford's wife, Sylvia, "knowingly given in response to *structured police questioning,* qualifies under any conceivable definition." (Emphasis added.) Id.

{¶ 13} In the case sub judice, Detective Martin came upon the scene at about 2:00 p.m. on September 20, 2001, and commenced his interview with Nathan about 20 minutes later. He testified at trial that he had received training in interviewing young children. The state's presentation at trial of Martin's interviewing procedure is set forth as follows:

{¶ 14} "Q. Are there things you do, Detective, to attempt to facilitate a conversation with a child to make it easier for the child?

{¶ 15} "A. Yes.

{¶ 16} "Q. Tell the jury some of the things you do to make it easier for the child?

{¶ 17} "A. Well, basically I try to like find out their likes, dislikes. Get a basic knowledge of the child. Try to listen intensely as the child is speaking.

{¶ 18} "I've never spoken to a lot of these kids I have spoken to before. Get an understanding how well they receive information. How well they are able to relate that information back to me.

{¶ 19} "A lot of times I'll go one-on-one conversation, which means I use anywhere from baby dolls to teddy bears, things of that nature, to have the child actually talk to a teddy bear or something of that nature instead of talking to an adult. Have him concentrate just looking at the teddy bear like it was the teddy bear he was talking to and not I as a person.

{¶ 20} "I also try to get down to their level, which means if somebody is sitting in a chair, I'll get lower than they are so the child is not looking up at me. They're looking down at me. If they are on the ground, I'll get on the ground.

{¶ 21} "Q. In this case when you initially approached Nathan, he was on his grandpa's lap, sitting on the ground, correct?

{¶ 22} "A. Correct.

{¶ 23} "Q. How did you talk to him physically? How were you positioned?

{¶ 24} "A. I laid down on my stomach and was talking to him.

{¶ 25} "Q. Was Nathan eventually able to tell you his name?

{¶ 26} "A. Yes.

{¶ 27} "Q. And his age?

{¶ 28} "A. Yes.

{¶ 29} "Q. What he liked to do?

{¶ 30} "A. Yes.

{¶ 31} "Q. What type of questions do you attempt to ask when you're interviewing a child?

{¶ 32} "A. Attempt to locate—or attempt to identify what information the child might have as to what had happened.

{¶ 33} "Q. Did you ask Nathan anything about the evening before?

{¶ 34} "A. I did.

{¶ 35} "Q. What did you ask Nathan?

{¶ 36} "A. Basically what he had did the night before, where he had went.

{¶ 37} "Q. Did he tell you what he had done the night before?

{¶ 38} "A. He did.

{¶ 39} "Q. What did he tell you he had done the night before?

{¶ 40} "A. Went to the fair.

{¶ 41} "Q. And who did he say he had gone to the fair with did he tell you?

{¶ 42} "A. Mommy and Terrie.

{¶ 43} "Q. Did you ask him anything more about the evening before?

{¶ 44} "A. Yes.

{¶ 45} "Q. Tell the jury what you talked about."

{¶ 46} Martin continued asking Nathan some questions about the trip to the county fair the night before, then asked him if anything had scared him that night after returning home. Nathan told him, "Daddy did." Martin then asked him how appellant had scared him, to which the child replied, "Knocking loudly." When Martin asked him what he meant, Nathan jumped off his grandfather's lap, where he had been sitting, and ran to the front door to demonstrate. Martin then asked Nathan if anything else had scared him. Nathan replied, "Daddy, mommy fighting." When asked where this had occurred, Nathan said it had taken place in the garage.

{¶ 47} Martin initially spoke with the child for about 30 to 45 minutes. At that point, Nathan indicated that he was hungry, and Martin also noted that Nathan was behaving as though he wanted to go back into the house to find Barbara. Martin therefore agreed to let Terrie, Barbara's friend, take the child away from the area to get something to eat. Martin directed Terrie to forbid anyone to question the child during that period.

{¶ 48} When Nathan was brought back to the yard after his meal, Martin, joined by Jenny Taylor, a children's services investigator, asked Nathan if "anyone was hurting mommy" during the prior night's incident. Nathan stated, "Daddy did." Martin then asked Nathan some questions, using Taylor as a mock victim. Martin held Taylor in certain fighting positions, finally standing to the back of Taylor and putting his arm around her in a hold position. Martin then asked Nathan, "Like that?" Nathan replied, "Up." Martin then moved his arm up towards Taylor's neck or throat area. At that point, Nathan said, "Yes," and he started crying. Martin finally asked Nathan, in reference to the hanging rope, if he knew who had put the "yellow thing" around Nathan's mother. Nathan answered that "daddy" had done it.

{¶ 49} In light of the above testimony, we conclude that Detective Martin's questioning of Nathan, although resulting in allowable "excited utterances" under the Ohio Rules of Evidence, was nonetheless a structured police

interrogation as envisioned in *Crawford* and therefore constituted testimonial evidence.[1] Because there is presently no cognizable dispute concerning whether the child was unavailable for the pre-*Crawford* trial and whether defense counsel was given a prior opportunity to cross-examine him, and having concluded that Nathan Siler's statements were testimonial evidence under *Crawford*, we must now determine whether the Confrontation Clause error was "harmless beyond a reasonable doubt." See, e.g., *Flores v. Nevada* (Nev.2005), 120 P.3d 1170, 1180, citing *Chapman v. California* (1967), 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705. In order to make this determination, we must inquire "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *State v. Madrigal* (2000), 87 Ohio St.3d 378, 388, 721 N.E.2d 52, citing *Chapman,* supra.

{¶ 50} Having again reviewed the record, we conclude that the admission of Nathan's statements was not harmless beyond a reasonable doubt. Certainly, as we noted in *Siler I,* in the months preceding Barbara's death, she and appellant had experienced significant marital problems, and appellant had been upset about a terminated affair Barbara had carried on with one of her co-workers. In late July 2001, just two months prior to her death, Barbara obtained a temporary protection order. At that point, appellant moved into the home of his brother, Kevin Siler, and Kevin's wife. On the evening of September 19, 2001, appellant did some basement remodeling work with Kevin and then watched TV with his brother. Kevin's wife went to bed at about 4:00 a.m. on September 20, 2001. About 15 minutes later, she awoke to sounds of banging and "clunking" from appellant's room. When she got up later, appellant and Kevin were gone from the house. Barbara's body was discovered by a sheriff deputy at about 1:45 p.m. that day, after Barbara's father had gone to her residence to check on her. The coroner later estimated her time of death as between 4:00 a.m. and 6:00 a.m. that morning. The outside door into the garage was ajar, as was the door from the garage to the house. Sheriff deputies, interviewing appellant that same day, observed that appellant's hands had red marks near each thumb and some of his fingers. Appellant also had scratch marks on top of some of his knuckles and on his chest, near his neck. The yellow rope around Barbara's neck contained traces of DNA, from which appellant could not be excluded as a source. No similar rope was found in the house. Thus, there was a body of circumstantial evidence pointing to appellant, but we find that this remaining evidence, absent Nathan's

---

1. Appellant also argues that a testimonial statement and an excited utterance are mutually exclusive. However, the Indiana appellate case cited by appellant in support, *Fowler v. State* (Ind.Ct.App.2004), 809 N.E.2d 960, has since been abrogated by the Indiana Supreme Court, which has held that a statement that qualifies as an excited utterance is not necessarily nontestimonial under the Confrontation Clause. See *Hammon v. State* (Ind.2005), 829 N.E.2d 444.

statements, does not provide overwhelming proof of appellant's guilt for purposes of a "harmless error" analysis by this court. Cf. *State v. Goff,* Summit App. No. 21320, 2005-Ohio-339, 2005 WL 236377, ¶ 12, 13. Even if we were to take into consideration, as the state suggests, Nathan's statement to Martin that he had seen "mommy, daddy fighting," an utterance the child made in the early phase of the interview, we would remain unconvinced that the introduction of the remaining statements was harmless.

{¶ 51} Therefore, upon further consideration as directed by the United States Supreme Court, we are persuaded that appellant is entitled to a new trial pursuant to *Crawford,* although we reiterate for purposes of our remand that the Confrontation Clause "does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *State v. Marbury,* Montgomery App. No. 19226, 2004-Ohio-1817, 2004 WL 758404, ¶ 38, citing *Crawford,* 541 U.S. at 59, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 9.

{¶ 52} Appellant's sole assignment of error is sustained.

{¶ 53} For the foregoing reasons, the judgment of the Court of Common Pleas, Ashland County, Ohio, is hereby reversed, and the cause is remanded for a new trial.

Judgment reversed
and cause remanded.

BOGGINS, P.J., and GWIN, J., concur.